Raul GONZALES, et al., Plaintiffs,

v.

The CITY OF PEORIA, et al.,
Defendants.

No. CIV 78–618 PHX WEC.

United States District Court,
D. Arizona.

April 19, 1982.

Kenneth L. Schorr, Angel Saenz, Mario Moreno, Jerome Blake and Luis Kame, Community Legal Services, Phoenix, Ariz., for plaintiffs.

Hiner & Crowe, Phoenix, Ariz., for defendants.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

CRAIG, District Judge.

## I.  FINDINGS OF FACT

1.  Guadalupe Junior Sanchez is a citizen of the United States, is a minor, and sues by his father and next friend, Guadalupe Sanchez.

2.  Reinaldo Arbiso, Pedro Ramirez, Socorro Guerra, Pablo Trejo, Bernarbe Garay, Aurelio Gonzales and Gustavo Gonzales are citizens and permanent residents of Mexico who migrate to Maricopa County, Arizona to harvest citrus crops.

3.  Raul Gonzales, Jose Manuel Quintanilla and Magdaleno Chavez-Diosdado are citizens of Mexico, reside in Maricopa County, Arizona and have lawful residency status in the United States.

4.  The City of Peoria is an incorporated city pursuant to the Constitution and Statutes of the State of Arizona.

5.  Newlin Happersett was Chief of Police of the Peoria Police Department and had supervisory authority and responsibility for the operation of that department and the conduct of personnel assigned to it, from October 1, 1976 to October 1, 1979.

6.  Donald Cuker was Deputy Chief of Police of the Peoria Police Department and had authority to act as Chief of Police in the absence of Newlin Happersett, from October 1, 1976 to October 1, 1979.

7.  Roy Foltz is an officer of the Peoria Police Department and has had supervisory responsibility for the field operations division and the conduct of personnel assigned to it from June, 1981 to the present.  Foltz also had supervisory responsibility for the field operations division from November, 1976 through August, 1978.

8.  Michael Watters, Jerry Gragg, Michael Branham and Veril Luttrell are officers of the Peoria Police Department.  Michael Watters and Jerry Gragg served as watch commanders in the Field Operations Division and had supervisory responsibility for the conduct of personnel so assigned.  Michael Watters had supervisory responsibility for the conduct of the Field Operations Division and the conduct of personnel assigned to it from August, 1978 through June, 1981.

9.  Mel Clow was City Manager of the City of Peoria, had responsibility for the business administration of all of the affairs of the City which are under his control, including law enforcement, and had authority to control, order and give appropriate directions to all heads of departments and to subordinate officers and employees of the City under his jurisdiction, including the police department through their department heads, from September, 1977 to October 10, 1978.

10.  Robert K. Hensley was Mayor of the City of Peoria and a member of the City Council from September, 1977 to May, 1979.

11.  Joe Chase was a member of the Peoria City Council from September, 1977 to May, 1979.

12.  Manuel Levya is deceased and was a member of the Peoria City Council from September, 1977 to May, 1979.

13.  Joanne Smith was a member of the Peoria City Council from September, 1977 to May, 1979.

14.  Edmund Tang has been a member of the Peoria City Council from September, 1977 to the present.

15.  J. Don Wagoner was a member of the Peoria City Council from September, 1977 to May, 1979.

16.  Coy E. Wharton, Sr. was a member of the Peoria City Council from September, 1977 to October 14, 1980.

17. The City Council appoints and supervises the City Manager and all department heads, and establishes the general responsibilities and duties of all city departments acting through the city employees. The following persons occupied the positions of Mayor, City Manager, Chief of Police and City Council during the times stated:

| Name | Position | Dates |
|---|---|---|
| Edmund Tang | Mayor | May, 1979 to present |
| William E. Vaughn, Jr. | Acting City Manager | October 24, 1978 to January 23, 1979 |
| | | January 23, 1979 to October 26, 1979 |
| Richard Gomez | Acting City Manager | October 29, 1979 to April 20, 1980 |
| Larry A. Celaya | City Manager | April 21, 1980 to January 13, 1981 |
| Richard Gomez | Acting City Manager | January 19, 1981 to May 11, 1981 |
| James Walker | City Manager | May 11, 1981 to present |
| Newlin Happersett | Chief of Police | October 1, 1976 to October 1, 1979 |
| Donald J. Cuker | Chief of Police | October 1, 1979 to present |
| Robert Bloom | Council Member | May, 1979 to December 26, 1979 |
| Johnny Osuna | Council Member | January 8, 1980 to present |
| Donald Buckeye | Council Member | May, 1979 to present |
| Robert K. Hensley | Council Member | October 14, 1980 to May, 1981 |
| Russell Gibbs | Council Member | May, 1979 to December, 8, 1981; January 5, 1981 to present |
| Harold Gerry | Council Member | May, 1979 to May, 1981 |
| Richard Palmer | Council Member | May, 1981 to present |
| James Brown | Council Member | May, 1981 to present |
| David Murillo | Council Member | September 8, 1981 to present |

18. On September 13, 1977, the Peoria Police Department received a request from the United States Border Patrol to detain between four and eight persons who were expected to arrive at Saliba's Market, Peoria, Arizona that afternoon at approximately 5:30 p. m. in a blue and white Chevrolet pickup truck. In response to that request, officers went to Saliba's, apprehended four persons they determined to be undocumented aliens, and thereafter released them to the custody of the Border Patrol. No plaintiffs were involved in this incident.

19. On February 18, 1978, Officer James Flonacher was driving his police car in the area of Saliba's Market. He observed a group of people standing around a pickup truck-camper and a large pile of food stuffs, and creating a partial traffic disruption in the street outside the market. Flonacher inquired of the driver, Reuben Villegas, as to what the people were doing in the street and ascertained that they were undocumented aliens. Plaintiffs Reinaldo Arbiso and Pedro Ramirez were arrested, walked approximately one block to the Po-

lice Department, and put in contact with the U.S. Border Patrol. The Border Patrol placed an immigration hold on the subjects, who were thereafter released to the custody of federal authorities.

20. On February 21, 1978, officers of the Peoria Police Department drove to the area of 83rd Avenue and Bell Road in response to a complaint that 25–30 people were loitering in the area. The officers arrived at the scene, investigated the area, and did not detain, interrogate, or arrest anyone.

21. On April 15, 1978, officers of the Peoria Police Department received a notification from their dispatcher that there was a fight in progress at Bodine's Market near the intersection of 83rd Avenue and Bell Road. Officers drove to that location and saw a group of people standing around and at least two people pushing and shoving one another. The officers detained some of the people for questioning. During the course of questioning, the officers determined that plaintiffs Pablo Trejo and Socorro Guerra were undocumented aliens. Trejo and Guerra were put in contact with the U.S. Border Patrol, which placed an immigration hold on them. They were thereafter released to the custody of the federal authorities. Plaintiff Guadalupe Junior Sanchez was physically detained for brief questioning and was thereafter released. No unreasonable or excessive force was used by the police on Mr. Sanchez.

22. On June 26, 1978, Detective William Cain observed two people walking very rapidly from the front of the Post Office in Peoria and entering an automobile with two other people. Officer Cain's suspicions were aroused, so after the car pulled away, he stopped it and asked the driver, plaintiff Quintanilla, for his driver's license. Quintanilla did not have one. Cain then requested and received other identification from Quintanilla and the passenger in the front seat, plaintiff Raul Gonzales. Cain requested but received no identification from the passengers in the back seat, plaintiffs Aurelio and Gustavo Gonzales, whom he believed to be the same two people he had seen walking rapidly from the front of the Post Office. He determined that the Gonzales passengers were undocumented aliens. The U.S. Border Patrol was contacted and an immigration hold was placed on the subjects. One subject was released to the custody of the federal authorities and the other was released to the custody of his counsel because he claimed to be ill.

23. On October 2, 1981, Officer David Smith saw a car with three people in the front seat enter the Pueblo Plaza Shopping Center, Peoria, Arizona and park in the rear alley. The area in which they parked was not one from which shoppers entered shopping center stores for business. Smith detained and questioned the driver, plaintiff Chavez. He determined that the two passengers, not plaintiffs in this action, were undocumented aliens. After plaintiff Chavez produced identification, he was released. An immigration hold was placed on the two passengers and they were then turned over to the custody of the U.S. Border Patrol.

24. It is not the adopted pattern and practice of the Peoria Police Department and the other defendants to stop, detain and interrogate persons of Mexican descent regarding their right to remain in the United States while they are either walking or driving through the City of Peoria. In fact, consistent enforcement of the immigration laws would create major logistical problems for the relatively small police force.

25. The Peoria Police Department acted in cooperation with the United States Border Patrol and the United States Immigration and Naturalization Service in connection with the enforcement of criminal federal immigration laws.

26. The defendants acted in accordance with the policies and directions provided to them by the United States Attorney for the District of Arizona and the applicable federal law enforcement agencies concerned with the enforcement of the immigration laws.

27. There is no evidence that the defendants unlawfully entered the homes of persons of Mexican descent in search of undocumented aliens.

28. There is no evidence that the defendants acted intentionally and with knowledge that their actions were, as has been alleged, unlawful solely because plaintiffs were of Mexican descent and spoke Spanish.

29. There is no evidence that the defendants were motivated by any racial animus toward the plaintiffs or other persons of Mexican descent.

30. The defendants acted in good faith.

31. The defendants possessed a reasonable suspicion of criminal activity sufficient to initiate the stop and questioning of the individual plaintiffs. Thereafter, though the individual police officers did not possess special expertise with respect to the immigration laws, they did acquire probable cause sufficient to effect an arrest for either an independent state violation or a violation of the federal criminal immigration laws. There is insufficient evidence of any continuing and persistent pattern of conduct the effect of which will be to undermine the future exercise of plaintiffs' rights.

32. The policies and practices of the Peoria Police Department were determined by its Chief of Police with the advice of the City Manager and the City Attorney. The police department had the right to rely on the advice of counsel, the City Attorney, following consultation with the United States Attorney.

33. Only two plaintiffs testified at trial, and they failed to make a showing with respect to damages that they have incurred as a result of any deprivation of their rights by the defendants. The record fails to establish damages sustained by any of the remaining plaintiffs.

## II. CONCLUSIONS OF LAW

■ 1. State and local law enforcement officers may arrest people for violations of federal immigration laws.

2. The policy of the Peoria Police Department regarding immigration violations is in accordance with state and federal law.

■ 3. A state law enforcement officer may effect an arrest based upon probable cause for a misdemeanor committed outside his presence pursuant to A.R.S. § 13–3883(4). If during the interim federal authorities are contacted and they direct local authorities to place an immigration hold on the subject, no deprivation of rights results.

■ 4. Even if a violation of 8 U.S.C. § 1325 is not a continuing offense in all cases under *United States v. Rincon-Jiminez*, 595 F.2d 1192 (9th Cir. 1979), officers may nevertheless effect an arrest for misdemeanors which they have probable cause to believe have been committed. A.R.S. § 13–3883(4).

■ 5. During the course of carrying out their normal duties, officers may also temporarily detain persons, for a brief period, if there is probable cause to believe that those persons illegally entered the United States or violated other provisions of the federal criminal laws.

■ 6. The individual defendants acted in good faith and are entitled to qualified immunity against the claims asserted by the plaintiffs, *see Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and are not subject to liability to the plaintiffs for money damages.

■ 7. The City of Peoria is not subject to a claim for punitive damages by the plaintiffs. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

■ 8. Plaintiffs have failed to establish by a preponderance of the evidence that the defendants denied them any rights secured them by 42 U.S.C. § 1981.

9. Plaintiffs have failed to establish by a preponderance of the evidence that the defendants denied them any rights, privileges, or immunities secured by the Constitution and laws of the United States under 42 U.S.C. § 1983.

10. Plaintiffs have failed to establish by a preponderance of the evidence that the acts of the defendants constituted a conspiracy to violate the rights of plaintiffs under 42 U.S.C. § 1985.

11. Plaintiffs have failed to establish by a preponderance of the evidence that the defendants' failure to prevent the acts alleged in the complaint entitle them to damages under 42 U.S.C. § 1986.

12. Plaintiffs have failed to establish by a preponderance of the evidence any damages which they allegedly suffered as a result of the defendants' claimed deprivation of plaintiffs' rights and, therefore, are not entitled to compensatory damages from any of the defendants, notwithstanding whatever merit their claims might have had.

13. There is insufficient basis to support the entry of a permanent injunction against the defendants. Plaintiffs have made no showing that they face any substantial likelihood of being subjected to future deprivations of their rights. Plaintiffs have also failed to establish by a preponderance of the evidence that the defendants engage in a continuing and persistent pattern of proscribed conduct.

14. Plaintiffs have made no legal or factual showing sufficient to establish the existence of racial animus or other improper motives of the defendants.

15. The acts of the defendants did not violate the rights of plaintiffs to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments of the Constitution.

16. The acts of the defendants did not violate the rights of the plaintiffs to Due Process and Equal Protection under the Fourteenth Amendment of the Constitution.

17. Costs will be awarded the defendants as provided by law.

18. A judgment is simultaneously issued from this court in accordance with these findings and conclusions.

19. These findings and conclusions are entered pursuant to Rule 52, Federal Rules of Civil Procedure. Any findings of fact which are more properly conclusions of law should be construed as conclusions of law. Any conclusions of law which are more properly findings of fact should be construed as findings of fact.

IT IS SO ORDERED.